UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SING FOR SERVICE, LLC, d/b/a MEPCO, a Delaware limited liability company,<br><br>           Plaintiff,<br><br>  -against-<br><br>UNITED SERVICE CONTRACT GROUP, LLC, d/b/a PROTECT MY CAR and PMC, a New Jersey limited liability company, UNITED SERVICE CONTRACT GROUP OF FLORIDA, INC., a Florida corporation, CRAIG RUBINO, JOSEPH RUBINO, and VIRGINIA SURETY COMPANY, INC., a Missouri corporation,<br><br>           Defendants. | **COMPLAINT**<br><br>No. 20-CV-____ |

Plaintiff, SING for Service, LLC d/b/a Mepco ("Mepco"), by and through its undersigned counsel, states the following for its Complaint against Defendants United Service Contract Group, LLC d/b/a Protect My Car and PMC; United Service Contract Group of Florida, Inc.; Craig Rubino; Joseph Rubino; and Virginia Surety Company, Inc.:

### INTRODUCTION

1. This case is about a series of contracts and guaranties breached by the Defendants. After breaching their obligations to Mepco under so-called "Administrator Agreements," as described below, Defendant USCG (defined below) entered into a Settlement Agreement with Mepco which was personally guaranteed by each of the Defendants Craig Rubino and Joseph Rubino.

2. Thereafter, USCG and the Rubinos breached the Settlement Agreement as well.

3. Defendant Virginia Surety Company, Inc. guaranteed USCG's contractual performance to Mepco and it, too, has unlawfully refused to honor its legal obligations to Mepco.

4. Accordingly, Mepco brings this action to enforce its rights under the series of agreements, further described below, as against these Defendants.

## PARTIES

5. Mepco is a Delaware limited liability company with its principal place of business at 205 North Michigan Avenue, Chicago, Illinois. Seabury Asset Management I LLC ("SAM I") is the sole member of Mepco. SAM I is a Delaware limited liability company with its principal place of business in Los Angeles, California. Seabury Asset Management II LLC ("SAM") is the sole member of SAM I. SAM is a Delaware limited liability company with its principal place of business in Los Angeles, California. Seabury Capital, LLC ("Seabury Capital") is the sole member of SAM. Seabury Capital is a Delaware limited liability company with its principal place of business in New York, New York. Seabury International Holdings, Inc. ("Seabury International") is the sole member of Seabury Capital. Seabury International is a Delaware corporation with its principal place of business in New York, New York.

6. Upon information and belief, Defendant United Service Contract Group, LLC d/b/a Protect My Car and PMC ("United Service Contract Group") is a New Jersey limited liability company with its principal place of business located in Florida. Upon information and belief, all members of United Service Contract Group are citizens of New Jersey or Florida. All individuals and all entities acting in the name of, and on behalf of, United Service Contract Group, with whom Mepco has interacted, are citizens of New Jersey or Florida, upon information and belief. Mepco is unaware of any member of United Service Contract Group that is not a citizen of New Jersey or Florida.

2

7. Upon information and belief, Defendant United Service Contract Group of Florida, Inc. ("USCG Florida," and, collectively with United Service Contract Group, "USCG"), is a Florida corporation with its principal place of business located in Florida.

8. Upon information and belief, Defendant Craig Rubino is a resident of the state of Florida.

9. Upon information and belief, Defendant Joseph Rubino (collectively with Craig Rubino, the "Rubinos") is a resident of the state of Florida.

10. Upon information and belief, Defendant Virginia Surety Company, Inc. ("Virginia Surety"), is a Missouri corporation with its principal place of business in Chicago, Illinois.

## JURISDICTION AND VENUE

11. This Court has jurisdiction to hear this action pursuant to Title 28, United States Code, Section 1332, as there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. Venue is appropriate in this district pursuant to Title 28, United States Code, Section 1391, because a substantial part of the events or omissions giving rise to the claims occurred in this district and because of the forum-selection clause contained in the parties' operative agreement.

13. Specifically, pursuant to a settlement agreement among Mepco, USCG, and the Rubinos (the "Settlement Agreement"), each of those parties agreed "that any claim, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the United States District Court for the Southern District of New York . . . ." *See* Settlement Agreement, attached as **Exhibit A**, at ¶ 14. Further, each party to the Settlement Agreement "consent[ed] to the jurisdiction of [this Court] . . . and irrevocably waive[d], to the fullest extent

permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such claim . . . ." *Id.*

## **FACTUAL BACKGROUND**

14. Mepco is in the business of providing funding to sellers and administrators of vehicle service contracts ("Service Contracts"). Service Contracts are contracts that provide additional protection for automobile owners either by supplementing the protections of an existing factory warranty or by extending the coverage period beyond the expiration of a factory warranty.

### **Mepco's Funding Allows USCG to Market Its Service Contracts with Monthly Payment Plans While Receiving Advance Payment in Full for those Service Contracts.**

15. Service Contracts are provided by companies known as "Administrators." In many instances, Service Contracts are marketed and sold by third-party vendors known as "Sellers." Pursuant to written agreements, Mepco provides funding to both the Sellers and the Administrators of Service Contracts. Specifically, Mepco funds to Administrators the full amount that they would receive from purchasers for the Service Contracts ("Seller Cost") and funds to Sellers their commission from the sale of the Service Contracts ("Seller Profit") before either of those items are "earned" by Administrators and Sellers, respectively. The Administrators and Sellers earn those amounts only when they are fully paid for by the purchasers of the Service Contracts.

16. Defendant USCG is an Administrator of Service Contracts.

17. Mepco and USCG are parties to a written agreement with the effective date of January 1, 2017 (the "Administrator Agreement"). A true and correct copy of the Administrator Agreement is attached as **Exhibit B**.

18. Pursuant to the Administrator Agreement, Mepco agreed to provide funding to USCG and to the Sellers of Service Contracts administered by USCG. As an Administrator of

4

Service Contracts, USCG handles and administers claims submitted by the purchasers of its Service Contracts.

19. With Mepco's advance funding, USCG and its Sellers do not have to rely on up-front payments from the consumer purchasers to pay for the Service Contracts. Instead, Mepco pays USCG and its Sellers up-front the entire amount that those parties are contractually entitled to make from the sale of each Service Contract, minus a "Discount Amount" that essentially represents Mepco's profit on the funding transaction and for Mepco's payment plan processing services.

20. Mepco's funding thus enables USCG and its Sellers to offer each consumer who purchases a Service Contract the option of making monthly payments over time to Mepco, pursuant to a "Payment Plan Agreement," rather than having to pay the entire amount of the Service Contract up-front to USCG and its Seller. Notably, Mepco's funding to the individual purchasers is not at all based on their creditworthiness. That is so because, pursuant to the Administrator Agreement (between Mepco, on the one hand, and USCG, on the other), Mepco's recourse for the failure to recover the full payment from any particular purchaser is not against the purchaser, but rather against USCG and its Sellers, through a pro rata refund of the funding that Mepco has advanced.

**Mepco's Payment Plan Agreements and the Administrator Agreement Provide for the Repayment of Mepco's Funding in the Event a Service Contract is Cancelled.**

21. With respect to each Service Contract for which Mepco provided advance funding to USCG and its Sellers, Mepco entered into a Payment Plan Agreement with the purchaser, under which the purchaser was obligated to make monthly payments to Mepco. As the purchasers of Service Contracts make their monthly payments to Mepco, in turn, Mepco is thereby repaid for the monies that it previously advanced to USCG and USCG's Sellers. If a purchaser makes all of

the scheduled monthly payments, Mepco is fully reimbursed, and compensated for its funding to USCG and its Seller.

22.     Under the terms of each Service Contract and Payment Plan Agreement, the purchaser has the right to cancel the Service Contract at any time.  Because the entire price of the Service Contract is paid in full at the outset, either by Mepco or by the purchaser, a full or partial refund is owed (either to Mepco or to the purchaser) when a Service Contract is cancelled prior to the expiration of its term, based upon the specific terms and conditions of the Service Contract.

23.     For example, pursuant to USCG's Service Contracts, purchasers are entitled to full refunds of any amounts paid if they cancel their Service Contracts within a certain period of time.  After that initial cancellation period, purchasers who cancel are entitled to a pro rata refund based on either the amount of time or mileage left on the Service Contract.

24.     The cancellation of a Service Contract also triggers an independent refund obligation on the part of USCG to Mepco for the as yet un-repaid funding that Mepco advanced to USCG and its Seller.  Specifically, Section 3 of the Administrator Agreement makes USCG responsible for the full "Refund Amount" owing to Mepco upon cancellation of a Service Contract and related Payment Plan Agreement.  This Refund Amount—as defined in Appendix A to the Administrator Agreement—includes the following: "(i) the amount of the Seller Cost funded by [Mepco], *plus* (ii) the amount of the Seller Profit funded by [Mepco], *plus* (iii) the Discount Amount, *plus* (iv) all late fees and other fees and charges assessed pursuant to the provisions of the Payment Plan Agreement, *less* (v) any payments received by [Mepco] with respect to such account."  *See* Ex. B at App'x A (emphasis in original).

25.     With respect to Service Contracts for which Mepco has advanced funding, Mepco's Payment Plan Agreements with the purchasers of those Service Contracts specifically provide that

the purchasers assign to Mepco the right to receive the refund amounts that might otherwise be due to the purchasers under the Service Contracts.

26. USCG is fully aware—based, among other things, upon the terms of the Administrator Agreement and the parties' course of dealing—that Mepco enjoys in its favor the assignment of each purchaser's rights under Service Contracts to receive all refunded amounts that would otherwise be due to purchasers under the Service Contracts, on account of cancellation of the contracts before Mepco is fully compensated for the funding it advanced.

27. Accordingly, in the ordinary course, and consistent with Mepco's rights under the Administrator Agreement and Payment Plan Agreements, USCG has not issued refunds to purchasers upon their cancellation of Service Contracts for which Mepco has advanced funding, but instead has paid the full Refund Amounts to Mepco, pursuant to the Administrator Agreement. The payment of those Refund Amounts to Mepco has satisfied the refunds owed by USCG under the Service Contracts, which refunds were assigned to Mepco under its Payment Plan Agreements.

### **Virginia Surety Agrees to Guarantee USCG's Refund Liability to Mepco.**

28. USCG insures its obligations under the Service Contracts that it administers, including its refund obligations to Mepco, by purchasing insurance coverage.

29. In Section 4(b)(i) of the Administrator Agreement, USCG represented to Mepco that it would provide Mepco "with evidence that all amounts due to the provider of the Coverage (the 'Insurer') for all Accounts have been paid to Insurer and that the Coverage exists and applies to all Accounts." *See* Ex. B at § 4(b)(i). Moreover, Section 4(b)(vii) of the Administrator Agreement requires USCG, upon Mepco's request, to cause each insurance company that provides coverage for any of the subject Service Contracts to "execute and deliver to [Mepco] an Unconditional Guaranty Agreement or other guaranty, satisfactory to [Mepco], to fully guarantee

the payment and performance of all obligations of USCG pursuant to this Agreement." *Id*. at § 4(b)(vii).

30. Defendant Virginia Surety is the insurer and underwriter for USCG's Service Contracts, and it issued Contractual Liability Insurance Policy No. 10136 (the "CLIP") to USCG to insure USCG's performance of its obligations to Mepco under its Service Contracts. *See* Virginia Surety USCG CLIP, attached as **Exhibit C**.

31. Mepco requested that Virginia Surety guarantee USCG's refund obligations to Mepco under USCG's Administrator Agreement with Mepco, and Mepco sent a draft proposed "Joinder to Administrator Agreement" to Virginia Surety. *See* Draft Joinder Agreement, attached as **Exhibit D**. Under this proposed agreement, Virginia Surety would have guaranteed USCG's total Refund Amount liability to Mepco, as that term is defined in the Administrator Agreement.

32. Instead of executing Mepco's form of guaranty agreement, however, Virginia Surety drafted and tendered to Mepco a revised version of a guaranty of the refund liability assigned and owed to Mepco pursuant to Mepco's Payment Plan Agreements with purchasers of Service Contracts.

33. On May 22, 2018, a representative of Virginia Surety e-mailed representatives of Mepco with a proposed "guarantee from [Virginia Surety] to Mepco." *See* May 22, 2018 E-mail Correspondence, attached as **Exhibit E**. The Virginia Surety representative further indicated that once the guaranty was agreed upon by Mepco, it would be executed by an officer of Virginia Surety. *Id*. In its proposed guaranty agreement, Virginia Surety agreed to guarantee the payments of cancellation refunds that are payable upon the cancellation of Service Contracts, payments that the purchasers assigned to Mepco pursuant to the Payment Plan Agreements.

34. Mepco was agreeable with the proposed guaranty, and the document was executed by Virginia Surety on May 22, 2018 (the "Virginia Surety Guaranty"). *See* Virginia Surety Guaranty, attached as **Exhibit F**. The Virginia Surety Guaranty recites that Mepco "desires assurance that refunds owed to [purchasers] will be paid to MEPCO where [purchasers] have an outstanding debt with MEPCO if [USCG] is unable to perform its refund obligations owed to [purchasers]." *Id.* As such, Virginia Surety "agree[d] to pay the [purchaser's] refund amount to MEPCO on behalf of [USCG] under the terms of the [USCG CLIP]." *Id.*

35. Representatives of Mepco subsequently met with representatives of Virginia Surety at Virginia Surety's offices in July 2018. During that meeting, a representative of Virginia Surety confirmed that under the Virginia Surety Guaranty, Virginia Surety was liable to pay refund amounts due under the Service Contracts to Mepco in the event that USCG failed to do so.

36. Mepco advanced funding and conducted business with USCG during the Summer and Fall of 2018 in reliance, among other things, on the Virginia Surety Guaranty.

37. On October 3, 2018, Virginia Surety sent a correspondence to Mepco that attempted to unilaterally reduce the scope of Virginia Surety's obligation under the Virginia Surety Guaranty for Service Contracts funded after that date. *See* October 3, 2018 Correspondence, attached as **Exhibit G**. Virginia Surety further stated that its guaranty obligation to Mepco would be limited to some or all of the insurance premium payments that Virginia Surety received from USCG. *Id.*

38. Mepco, however, *never* consented to, or agreed with, any of the purported revised terms unilaterally set forth by Virginia Surety in its October 3, 2018 correspondence. Accordingly, those revised purported terms proposed by Virginia Surety have no legal force or effect whatsoever.

**USCG Defaults on Its Obligations with Mepco and Enters Into a Settlement Agreement.**

39. Upon information and belief, USCG was purchased by PMC Consolidated Holdings LLC ("PMC Holdings") on or around September 5, 2018.

40. Mepco was informed by USCG that, in connection with its anticipated purchase by PMC Holdings, USCG was undergoing a name change, and the principals at USCG asked Mepco to enter into a new administrator agreement to reflect those name changes, with the entities known as Protect My Car, LLC and Protect My Car Admin Services, Inc. (collectively, "PMC"). Mepco and USCG (doing business as PMC) entered into an administrator agreement on August 1, 2018 (the "PMC Administrator Agreement").

41. By early 2019, USCG was in default and material breach of both its Administrator Agreement and its PMC Administrator Agreement with Mepco, based on the failure to pay its contractually obligated Refund Amount liability to Mepco for monies that Mepco had previously advanced to USCG.

42. Thereafter, Mepco, USCG, and the Rubinos, who have an ownership interest in USCG, entered into the Settlement Agreement with an effective date of February 27, 2019, in an attempt to resolve USCG's liability owed to Mepco.

43. Under the Settlement Agreement, USCG promised various payments and other consideration to Mepco with respect to its current and future Refund Amount obligations to Mepco under its Administrator Agreement. *See* Ex. A at ¶ 3.

44. In particular, and as part of its consideration to Mepco to compensate Mepco for anticipated future Refund Amount liability, USCG agreed to assign to Mepco the right to receive any and all returned claims premiums from Virginia Surety:

> Within five business days of the Effective Date, the USCG Entities and the PMC Entities will provide a signed statement from Virginia Surety (i) detailing the

>current amount of reserves held by Virginia Surety and Assurant related to the Transferred Contracts, (ii) detailing the current amount of reserves (estimated by the USCG Entities to be approximately $8.5 million) held by Virginia Surety related to the USCG Contracts, and (iii) acknowledging that Virginia Surety has received irrevocable instructions from the USCG Entities and the PMC Entities for Virginia Surety to transfer returned claims premiums to Mepco consistent with the terms of subparagraph (a)(ii) above.

*Id.* at ¶ 3(b).

45. Mepco and USCG further agreed that on June 30, 2020, Mepco and USCG would work together in good faith to determine the amount of liability, if any, that was owed to Mepco as of that date. *Id.* at ¶ 3(c). That same provision further provides that if as of June 30, 2020, there was a "deficit," as that term is defined by the Settlement Agreement, then USCG would be obligated to wire funds in the amount of such deficit to Mepco within 5 days to correct the deficit. *Id.*

46. Pursuant to Paragraph 3(g) of the Settlement Agreement, USCG's failure to make any of the payments required under the Settlement Agreement, including the failure to timely make a required "deficit" payment, constitutes a material default and breach of the Settlement Agreement, entitling Mepco to recover the entire amount owed from USCG, along with contractual interest at the rate of 1.5% per month and reasonable attorney fees. *Id.* at ¶ 3(g).

47. In addition, the Settlement Agreement makes clear that Mepco's Administrator Agreement with USCG remains in full force and effect and continues to be fully enforceable by Mepco. *Id.* at ¶ 4.

48. USCG has a deficit to Mepco, within the meaning of the Settlement Agreement, and USCG did not take the required action to cure that deficit by wiring funds to Mepco. As a result, USCG is in default and material breach of the Settlement Agreement and the Administrator Agreement.

49. In addition, in connection with the Settlement Agreement, the Rubinos executed personal guaranties in favor of Mepco, guaranteeing USCG's payment obligations to Mepco under the Settlement Agreement. *See* Rubino Guaranty Agreements, attached as **Exhibits H** and **I**.

50. USCG's default and material breach of the Settlement Agreement gave rise to the Rubinos' liability under their Guaranty Agreements.

51. The Rubinos have not paid any amount to Mepco, however, in violation of their contractual obligations under the Rubino Guaranty Agreements.

52. Virginia Surety likewise has not paid any amount to Mepco, in violation of its obligations under the Virginia Surety Guaranty. Instead, Virginia Surety has without basis disavowed its lawful obligations to Mepco under its Guaranty.

### COUNT I: BREACH OF CONTRACT – SETTLEMENT AGREEMENT (AGAINST USCG)

53. Plaintiff hereby incorporates the allegations set forth in the preceding paragraphs as though set forth here in their entirety.

54. Mepco entered into a valid and enforceable contract with USCG, *i.e.* the Settlement Agreement. *See* Ex. A.

55. Mepco performed its obligations under the Settlement Agreement.

56. USCG materially breached the parties' contract by failing to pay amounts due and owing to Mepco under the Settlement Agreement.

57. USCG's material breaches of contract have caused damage to Mepco.

58. As of October 9, 2020, Mepco has been damaged by USCG's breach of contract in an amount in excess of $75,000, plus additional damages that continue to accrue, including interest, costs, and attorneys' fees.

### COUNT II: BREACH OF CONTRACT – ADMINISTRATOR AGREEMENT (AGAINST USCG)

59. Plaintiff hereby incorporates the allegations set forth in the preceding paragraphs as though set forth here in their entirety.

60. Mepco entered into a valid and enforceable contract with USCG, *i.e.* the Administrator Agreement. *See* Ex. B.

61. Mepco performed its obligations under the Administrator Agreement.

62. USCG materially breached the parties' contract by failing to pay amounts due and owing to Mepco under the Administrator Agreement.

63. USCG's material breaches of contract have caused damage to Mepco.

64. As of October 9, 2020, Mepco has been damaged by USCG's breach of contract in an amount in excess of $75,000, plus additional damages that continue to accrue, including interest, costs, and attorneys' fees.

### COUNT III: BREACH OF CONTRACT (AGAINST CRAIG RUBINO)

65. Plaintiff hereby incorporates the allegations set forth in the preceding paragraphs as though set forth here in their entirety.

66. Defendant Craig Rubino personally guaranteed the debt of USCG to Plaintiff. *See* Ex. H.

67. Craig Rubino's Guaranty Agreement is valid and enforceable.

68. Craig Rubino has failed to make the required payments under the Craig Rubino Guaranty Agreement and has thus breached his obligations under that agreement.

69. As of October 9, 2020, Plaintiff has been damaged by Craig Rubino's breach of the Guaranty Agreement in a total amount in excess of $75,000, plus additional damages that continue to accrue, including interest, costs, and attorneys' fees.

### COUNT IV: BREACH OF CONTRACT (AGAINST JOSEPH RUBINO)

70. Plaintiff hereby incorporates the allegations set forth in the preceding paragraphs as though set forth here in their entirety.

71. Defendant Joseph Rubino personally guaranteed the debt of USCG to Plaintiff. *See* Ex. I.

72. Joseph Rubino's Guaranty Agreement is valid and enforceable.

73. Joseph Rubino has failed to make the required payments under the Guaranty Agreement and has thus breached his obligations under that agreement.

74. As of October 9, 2020, Plaintiff has been damaged by Joseph Rubino's breach of the Guaranty Agreement in a total amount in excess of $75,000, plus additional damages that continue to accrue, including interest, costs, and attorneys' fees.

### COUNT V: BREACH OF CONTRACT (AGAINST VIRGINIA SURETY)

75. Plaintiff hereby incorporates the allegations set forth in the preceding paragraphs as though set forth here in their entirety.

76. Virginia Surety guaranteed the debt of USCG to Plaintiff. *See* Ex. F.

77. The Virginia Surety Guaranty is valid and enforceable.

78. Virginia Surety has failed to make the required payments under the Virginia Surety Guaranty and has thus breached its obligations under that agreement.

79. As of October 9, 2020, Plaintiff has been damaged by Virginia Surety's breach of the Virginia Surety Guaranty in a total amount in excess of $75,000, plus additional damages that continue to accrue, including interest, costs, and attorneys' fees.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(i)   award Plaintiff compensatory damages in excess of $75,000 in an amount to be determined at trial;

(ii)  award Plaintiff reimbursement of all costs and expenses incurred in connection with this litigation, including attorneys' fees; and

(v)   award Plaintiff such other relief as the Court deems just and proper.

Dated: New York, New York
October 9, 2020

                      WALDEN MACHT & HARAN LLP

*/s/ Jeffrey A. Udell*

Jeffrey A. Udell
Jeffery L. Ding
One Battery Park Plaza, 34th Floor
New York, NY 10004
(212) 335-2030

*Attorneys for Plaintiff SING for Service, LLC*